IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MARY J. RATHE, | ) | |
| | ) | |
| Plaintiff, | ) | 4:08CV3011 |
| | ) | |
| v. | ) | |
| | ) | |
| SOCIAL SECURITY | ) | **MEMORANDUM** |
| ADMINISTRATION, Michael J. | ) | **AND ORDER** |
| Astrue, Commissioner, | ) | |
| | ) | |
| Defendant. | ) | |

Everyone agrees that Mary J. Rathe (Rathe), who is now 58 years old, has a serious problem with her back and her bones. While finding that Rathe was generally credible, the Administrative Law Judge (ALJ) discounted Rathe's account of disabling pain. The ALJ did so after inviting Rathe's treating physician to submit post-hearing information. Believing that the physician failed to accept that invitation, the ALJ concluded that Rathe's condition was not as bad as Rathe claimed. Because the ALJ was unaware that Rathe's physician had submitted additional information in response to the ALJ's invitation, and because new information presented to the Appeals Council further calls into question the ALJ's credibility analysis, I will sustain the appeal and reverse and remand for reconsideration by the ALJ.

## *I.  BACKGROUND*

According to Dr. Thomas A. Gapp, a radiologist, and based upon x-rays taken on November 4, 2004, Rathe suffers from "significant thoracolumbar scoliosis with curvature to the right, centered at the T9 level" and this "curvature measures 70

degrees . . . ."[1] (Tr. 184.) In addition, Rathe suffers from "significant osteoporosis with subsequent increased fracture risk" according to a bone density examination conducted by Dr. Gapp at the same time.[2] (Tr. 183.)

In short, a radiologist confirmed, and there is no dispute, that Rathe had "significant" problems with her spine as well as her bones.[3] As a result, the ALJ properly labeled these impairments as "severe" even though they did not meet the "Listings." (Tr. 21.)

---

[1]"People with straight spines have a 0 degree curvature; at the other end of the spectrum are people with severe scoliosis, indicated by a curvature of 60 degrees or more." The University Hospital, Newark, NJ, *What is Scoliosis*?, p. 2, available at http://www.theuniversityhospital.com/scoliosis/html/aboutscoliosis/whatis.htm (last accessed October 27, 2008). Rathe's condition was obvious to a lay observer. Indeed, during the hearing, counsel had Rathe display her spine to the ALJ (Tr. 291) and asked "what's this extruded part here?" (Tr. 292.) Rathe replied "[t]hose are my ribs" and "that's where the pain is always at." (*Id.*)

[2]Rathe's "T-scores" were -2.94 for the femoral neck and -4.32 for the spine. *Id.* In statistical parlance, a "T-score" is a "standard deviation." A bone density test measures the patient's bone density against a normal healthy 30-year old adult and expresses the difference as a "T-score." National Osteoporosis Foundation, *Bone Mineral Density (BMD) Testing*, at p. 3, available at http://www.nof.org/osteoporosis/bmdtest.htm (last accessed October 28, 2008). According to the World Health Organization, a "T-score" of -2.5 or worse (meaning a greater negative number like -3.0, -3.5 or -4.0) warrants a diagnosis of osteoporosis. *Id.*

[3]Scoliosis and osteoporosis are frequently seen together and have been linked statistically. *See*, *e.g.*, Olvia D. Carter and Suzanne G. Haynes, International Journal of Epidemiology, *Prevalence Rates for Scoliosis in US Adults: Results from the First National Health and Nutrition Examination Survey*, at 1 (September 1, 1986), available at http://ije.oxfordjournals.org/cgi/content/abstract/16/4/537 (last accessed October 28, 2008) (based upon a statistical analysis of a large number of X-rays, "suggesting a possible association between scoliosis and osteoporosis").

Rathe was born on October 15, 1950. (Tr. 54.) Prior to asking the government for help, Rathe worked as a courier for Roche laboratories (for about nine years) or as an officer manager for Dr. Sandra Monroe (for about two years). (Tr. 143, 147, 295.)

Rathe sought disability benefits on August 5, 2004, claiming an on-set date of December 31, 2003, but, after a hearing on September 27, 2006, the ALJ concluded that she could return to her past relevant work despite her severe impairments. (Tr. 16-17, 21.) The ALJ came to this conclusion even though the vocational expert told the ALJ that Rathe could not return to her prior endeavors if Rathe's claim of pain was believed. (Tr. 298-299.)

Rathe testified that she suffered from her back condition all of her life, but the pain during the last six years "has been getting worse and worse." (Tr. 282.) Rathe's constant pain with analgesic medications, like the hydrocodone she was prescribed for daily use[4], was 7 out of 10 and without pain medications was 9 or 10 out of 10. (Tr. 285.)  Among other things, Rathe testified that she had severe pain whether she was standing or sitting (Tr. 286), that she could only sit for 10 minutes in a hard chair and 20 minutes in a soft chair (Tr. 287), that she frequently had to lie down, sometimes on the floor, to relieve the pain (Tr. 291), that she slept poorly because of the pain (Tr. 289), and that she suffered from "headaches . . . [a]ll the time" that are "so severe that I can't hold my head still." (Tr. 293.)

Near the conclusion of the hearing, the ALJ suggested that if Rathe wanted to provide an "opinion from your treating doctor . . . after the hearing you could also do

---

[4]According to the DEA, hydrocodone is "nearly equipotent to morphine for pain relief." U.S. Drug Enforcement Administration, *Hydrocodone*, at p. 1., available at http://www.usdoj.gov/dea/concern/hydrocodone.html (last accessed October 28, 2008).

that and send that to me." (Tr. 299.)[5]  On October 30, 2006, Rathe's lawyer sent a fax[6] to the ALJ enclosing a copy of the treating doctor's letter-report dated October 23, 2006, together with the doctor's office notes of September 6, 2006.  In her letter-report, Dr. Stacey D. Goodrich, M.D., the treating doctor, wrote the following:

> I am sending this letter at your request regarding Mary Rathe.  I have included a copy of my last dictation from the office regarding Mary's back pain and dextrorotary scoliosis.  As you can clearly see, she has significant pain and disability relative to the scoliosis which she has had since childhood.  I do not have current films actually measuring the curve but I think that clearly she has at least a 45° dextroscoliosis in the midthoracic spine.  She further has osteoporosis with significant negative T score and is on Actonel for this.  She has difficulty getting comfortable in bed or in a chair and doesn't sleep well due to her ongoing level of back pain.  She has had multiple medical therapies including chronic pain medications and anti-inflammatories and seems to get along reasonably well without any evidence of inappropriate medication use.  I think at age 56 the natural history of this illness is that it will continue to worsen over time with the possibility of increasing compression deformities and the ongoing possibility of restrictive lung disease and pulmonary problems.  As is outlined in my notes she has had problems at work due to her back pain and I have every indication that this problem will continue to worsen over time.  Hopefully this dictation is beneficial regarding her claim for disability used in conjunction with my dictated office note.

(Tr. 243.)

---

[5]At that time, the record included notes from the treating medical doctor, Dr. Stacey Goodrich, which spanned the period October 28, 2004 through November 16, 2005 and it also apparently included a note dated September 6, 2006. (Tr. 3, 179-187, and 225.)

[6]The record contains a "transmission report" indicating that the fax transmission was "successful" on October 30, 2006 at 11:28 A.M. (Tr. 244.)

-4-

The September 6, 2006 office notes, which were referenced in the faxed letter-report, provided the following details:

> Mary has terrible back pain. The last time she worked was 2004. At that time she just did clerical work, filing, office type of work and still found it almost unbearable. Her problem is she has severe scoliosis and has clearly had this for many, many years. She has probably at least a 45° curve, maybe larger. She is more rotatory in the lumbar spine and she has a major dextroscoliosis in the lower and mid T spine. We know she has osteoporosis. We have her on bisphosphonate therapy for this and she has had the DEXA scan showing a significant negative T score in the severe osteoporosis range. She has constant discomfort in her back. She takes both an anti-inflammatory and a narcotic analgesic on an ongoing basis. She has absolutely no evidence of drug abuse. There is no evidence of drug seeking behavior, drug craving or habituation with increased utilization. She has always been very compliant. She has difficulty getting a good night's sleep due to her back pain. She averages at least four nights a month where she essentially gets no sleep. She has sort of "phantom" type cramping pains in the muscles of her long bones, legs and arms periodically. Unclear whether this is a neurologic phenomenon or what is going on there but she finds those debilitating as well. Clearly, however, her major problem is her back. Any stooping, bending, lifting on any recurring basis or under any time constraint is impossible for her. She is able to take care of her ADLs and do the things she needs to do but only because she has reached a functionality over time from trial and error as long as she is able to work in her own environment at her own pace. This has really created problems as far as her ability to seek gainful employment going forward. She did bring her films today which I reviewed. I know that she has never had any CT scan or MRI scan of this spine to show relationships with nerve roots, disks, etc. although clearly her plain films show significant scoliosis and degenerative changes. She needed her bisphosphonate changed today due to insurance competitive bidding so we did go from Actonel to Fosamax otherwise we didn't really change anything today. She is getting along reasonably well on the current dose of medications she is taking.

> A: 1) Chronic and unremitting low and mid back pain due to her long-standing severe dextro and rotatory scoliosis.
>
> P: Continue current meds and treatments. Follow up as needed. It is unclear whether we need to do any additional studies. We will basically base this on her symptomatic need. SDG/sna

(Tr. 225.)

The ALJ issued her opinion on November 29, 2006. (Tr. 22.) In the opinion, the judge found Rathe "partly credible" and observed that the "claimant's demeanor during the hearing lent her some credibility." (Tr. 17.) However, and among other things, the ALJ concluded that the "objective medical evidence fails to fully support the claimant" because "[n]o examiner observed that she had abnormalities that would be expected to limit the claimant as severely as the claimant alleged." (Tr. 18.)

In this connection, and significantly, the ALJ wrote that "[a]fter [the] hearing the claimant and her attorney were given the opportunity to recontact Dr. Goodrich for any specific work restrictions, opinions or follow up. Despite a two month delay, nothing has been submitted." (Tr. 18.) Inexplicably, the ALJ was apparently unaware that Dr. Goodrich had in fact responded in a letter-report dated October 23, 2006.[7]

Following the ALJ's decision, and in 2007, Rathe was seen by other doctors including Kathryn M. Hajj, M.D., a rehabilitation specialist. (Tr. 229-234.) At that time, Dr. Hajj was Associate Medical Director of the BryanLGH Medical Center's

---

[7] It appears that the ALJ was aware of the September 2006 office note, but not the October 23, 2006 letter-report from Dr. Goodrich. In the opinion, the ALJ briefly referred to a note from Dr. Goodrich dated September of 2006. (Tr. 18 referring to Exhibit 9f. *See also* Tr. 3, referring to Ex. 9F, and Tr. 225.) However, and as stated in the text, the ALJ was evidently unaware of Dr. Goodrich's October letter-report.

Rehabilitation Program and she also engaged in a private practice that involved (1) providing independent medical examinations of injured workers; (2) rendering disability ratings; and (3) conducting preoperative evaluations for orthopedic and neurosurgeons regarding the muscle and skeletal problems of patients including the review of X-rays, MRI and CT scans.  (Tr. 266-267.)

On May 16, 2007, Dr. Hajj conducted an "Independent Medical Examination" of Rathe.  (Tr. 229-234.)   The doctor completed a history, and reviewed all the medical records that had been submitted to the ALJ as well as the ALJ's decision. (Tr. 229-230.)  She noted that Rathe had recently been seen by Dr. Dan Ripa, an orthopedic surgeon, who told Rathe that "the only treatment she would benefit from would be surgery and there were no other options to discuss."[8]  (Tr. 230.)  Doctor Hajj also conducted a physical examination of Rathe.  (Tr. 231.)  After that, Hajj prepared a detailed report.

In the report, the physician answered questions put to her by Rathe's counsel. Among other things, the lawyer asked: "In your opinion Doctor, is Ms. Rathe capable of engaging in full time competitive labor at a sedentary level . . . ?"  (Tr. 233.)  Dr. Hajj responded, "No." (Tr. 233.)  She then gave the following detailed opinion about the development and evolution of Rathe's spinal problem and the relationship of that problem to Rathe's claims of pain:

> By definition, Scoliosis is a spinal deformity characterized by curvature of the spine and vertebral rotation.  The cause can be "congenital" due to an early embryologic developmental defect or more commonly "unknown" or "idiopathic."  If a curvature develops when a child is growing such as between the ages of 4-10 years of age there is a high risk that the curvature will progress.  In the case of Ms. Rathe she recalls

---

[8]This is an accurate recitation of Dr. Ripa's conclusion reached on January 11, 2007, following an evaluation by Ripa and his physician's assistant.  (Tr. 237-238.)

an incident in her childhood where she was struck hard in her mid-back by her brother with a bat. This was more likely than not the inciting event. It apparently was the event that she remembers consistently which caused her back pain throughout her growth and development during adolescence.

As an adolescent continues to grow through puberty so does the degree of curvature. When Ms. Rathe was much younger the degree of curvature was much less and as she continued to grow so did the spinal curvature. She never received any care for the curvature but rather adjustments to assist her with muscles spasms that occur simultaneously around the areas of curvature. She was never evaluated for bracing to slow the progression or monitored for degree of curvature.

Within a reasonable degree of medical certainty Ms. Rathe has now gotten to a period in her life where she is postmenopausal and the degree of curvature is greater than 45 degrees. It is at this point in time when the curvature becomes so significant that Dr. Dan Ripa was able to explain so clearly at his initial appointment that the only option left is surgery. He is exactly right. Without surgery she will become more prone to vertebral or compression fractures in addition to possible herniated discs. Another common abnormality is a patient's decreased ability to take deep breaths and as a result more prone to pneumonia as they age. In general, her life expectancy is decreased as a result of the scoliosis without surgical intervention.

The pain that Ms. Rathe experiences at this time is directly related to her continued worsening spinal curvature from scoliosis which will not stay the same but only worsen over time. I believe she recognizes that she is in a very difficult situation because she sincerely does not want to have surgery but there are really no other alternatives. She unfortunately has fallen through the healthcare cracks and has never received any education or understanding of how serious the condition of scoliosis can become especially in later years.

In conclusion, this document is based on the available medical records, history, and physical examination of Ms. Rathe. All questions answered

> are rendered to a reasonable degree of medical certainty. If there are any
> questions regarding this document please do not hesitate to contact me.

(Tr. 233-234.)

Rathe sought review of the ALJ's decision by the Appeals Council. The foregoing information from Dr. Hajj, together with other information, was presented to that body. (Tr. 8A.) The Appeals Council explicitly "considered . . . the additional evidence," but, on November 23, 2007, it upheld the ALJ's decision. (Tr. 6.) This timely appeal followed.

## *II. ANALYSIS*

My legal analysis need only be brief. The ALJ's credibility decision is fatally flawed because she failed to acknowledge that Dr. Goodrich, the treating physician, had submitted an important report on Rathe's condition at the express invitation of the ALJ. *See*, *e.g.*, *Lamp v. Astrue*, 531 F.3d 629, 632-633 (8th Cir. 2008) (reversal and remand was required where, following the hearing, treating physician explained inconsistency in medical reports that concerned the ALJ); *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (reversal and remand was required where the credibility analysis of ALJ was contradicted by treating physician's report submitted following the hearing).

Furthermore, Dr. Hajj's post-decision evaluation and report, which was explicitly considered by the Appeals Council, is new and material information relating, at least in part, to the period on or before the ALJ's decision and that account further calls into question the validity of the ALJ's credibility analysis.[9] *See*, *e.g.*,

---

[9]Because a fair reading of the doctor's report indicates that she was commenting, at least in part, upon Rathe's condition during the relevant time frame, I disagree with the government that I may ignore Dr. Hajj's thoughtful submission.

-9-

*Cunningham v. Apfel*, 222 F.3d 496, 502 (8th Cir. 2000) (reversing decision of ALJ and holding that medical records, which post-dated hearing, related to conditions that existed during the relevant time frame and therefore must be considered when evaluating the sufficiency of the ALJ's decision; "The timing of an examination is not dispositive . . . .").

Accordingly,

IT IS ORDERED that the appeal is sustained and the decision of the Commissioner is reversed. This matter is remanded to the Commissioner for further proceedings consistent with the opinion of the court. A separate judgment will be issued.

October 29, 2008.

BY THE COURT:

*s/Richard G. Kopf*
United States District Judge